IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

| | |
|---|---|
| **JENNIFERE CLAYTON,** | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) C.A. No. _____ |
| | ) |
| **TRI  STATE RESTORATIONS, LLC**, | ) |
| *A Maryland Limited Liability Company*, | ) |
| | ) |
| Defendant. | ) |

## COMPLAINT AND JURY DEMAND

COMES NOW your plaintiff, JENNIFERE CLAYTON (hereinafter "Clayton" or "Plaintiff"), by counsel, and moves this Honorable Court for a judgment for legal and equitable relief in her favor against the Defendant, TRI STATE RESTORATIONS, LLC, (hereinafter, "Tri-State" or "Defendant"), and in support of said request respectfully alleges and avers as follows.

### Nature of the Action

1.      This is a civil action by Plaintiff JENNIFERE CLAYTON against her former employer,  TRI STATE RESTORATIONS, LLC, for violations of Title I of the Americans With Disabilities Act (ADA), 42 U.S.C. § 12112, as authorized through 42 U.S.C. § 12117, and discrimination, retaliation, and retaliatory discharge from employment, under the ADA and Title VII of the Civil Rights Act of 1964, on account of several instances of protected activity under those statutes, and for breach of contract.

### Parties, Jurisdiction and Venue

2.      At all relevant times herein, Plaintiff JENNIFERE CLAYTON was and is an adult, female American citizen, and a resident and domiciliary of the Commonwealth

of Virginia.  Ms. Clayton is currently 69 years of age, and is racially African American.

3.      Plaintiff Clayton was employed by Defendant TRI STATE

RESTORATION, LLC, and its related entities, from on or about  September 12, 2019,

until on or about June 10, 2020.

4.      At all times relevant hereto, Mark A. Wilson was the Managing Member

of the Defendant, and upon information and belief, was a decision-maker in various

decisions regarding the Plaintiff, including, but not limited to:  decision to require her to

adhere to a work schedule involving evening driving, decision not to accommodate her

disability, decisions regarding  plaintiff's work hours and pay, and decision to to

terminate the employment of the Plaintiff.

5.      At all times relevant to this Complaint, upon information and belief,  Mark

A. Wilson and/or Tara Wilson, acted as authorized management employee/s of

Defendant, and upon information and belief, each is a resident and domiciliary of the

State of Maryland, and made decisions pertaining to Plaintiff's employment, which was

primarily based in, and the performance of duties of which, mostly took place in the

Eastern District of Virginia; each is believed to have been a decision-maker in the

decisions to not accommodate, cut the work hours of, and terminate, the Plaintiff.

6.      Upon information and belief, at all relevant times herein, Defendant TRI

STATE RESTORATIONS, LLC ("Tri State" or "Defendant") was and is a Maryland

Limited Liability Company possessing a valid Certificate of Authority to Transact

Business in Virginia.  Upon information and belief, at all relevant times herein,

Defendant Tri State employed between 16 to 19 employees, on a full-time basis.

7.      This Court otherwise has subject matter jurisdiction of Ms. Clayton's

claims under the Americans With Disabilities Act, 42 U.S.C. § 12101, et seq. including § 12117, which cross-references the jurisdictional provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5(f)(1) and (3)), which provisions of the ADA also apply in their own right, to Plaintiff's claims of non-accommodation, disparate treatment and discharge, based upon disability.   This Court also has supplemental jurisdiction over Plaintiff's claim for breach of contract, pursuant to 28 U.S.C. § 1367(a), relating to unpaid commissions, as those claims are so related to the Plaintiff's other claims for damages herein, as to form part of the same case or controversy, pursuant to Article III of the United States Constitution.

8.     Tri State Restoration, LLC is subject to the personal jurisdiction of this Court pursuant to Va. Code § 8.01-328.1(A)(1), (2) and ((4), as it regularly transacts business and provides services in, and derives substantial revenue from, business in, this District, and as above, the principal locus of Plaintiff's employment with Tri State, and Plaintiff's performance of duties, took place in this judicial district, and Tri State derives substantial revenue from services rendered in the geographical area embraced by the Eastern District of Virginia.

9.     Upon information and belief, Tri State Restoration, LLC continues to be present in, and regularly conducts and affairs and business activities in, and continues to derive substantial revenue from, this judicial district.

10.     In addition to events occurring in and around Defendant's corporate offices located in Clarksburg, Montgomery County, Maryland, the causes of action alleged in this action arose in and around this judicial district, and involved Plaintiff's employment, which for Defendant, was primarily located in and around Prince William

County, Fairfax County, and Loudoun County, within the Eastern District of Virginia.

11.     The unlawful employment practices committed by Defendant occurred in connection with work to be performed, and actually performed, in this judicial district, and upon information and belief, but for the unlawful employment practices alleged herein, Plaintiff would have continued to be employed by Defendant, primarily in this this judicial district.

12.     Accordingly, pursuant to 42 U.S.C. § 12117(a), and in turn, 42 U.S.C. § 2000e-5(f)(3), venue is proper in this Court over Ms. Clayton's claims set forth below.

<u>Facts Common to All Claims</u>

13.     Ms. Clayton began her employment with Tri State Restoration on or about September 12, 2019, as a Business Development Specialist, for forty hours per week (full time), at a base salaried rate of $55,000 per annum, or $ 26.44 per hour, plus benefits, to include health insurance, and in addition thereto, commissions at the rate of 3% of the gross amount of any billings on any work and/or engagements produced from Plaintiff's efforts as a Business Development Specialist, and 5% of the gross margin of certain other work and/or engagements produced from Plaintiff's efforts, with a work schedule of 8:00 a.m. to 4:00 p.m. Under the parties' agreement, the primary locus of Plaintiff's employment, and the territories to be covered by Plaintiff, were to be Fairfax, Arlington, Loudoun and Prince William Counties, in the Commonwealth of Virginia.

14.     At all times relevant hereto, Ms. Clayton performed her job and functions in at least a satisfactory manner, and often exceeded her job requirements and legitimate job expectations.

15.     In accepting this employment, Plaintiff relied upon so much of

Defendant's position description for the position as stated that 95% of the Business Development Specialist position would take place within the "set territory of Fairfax/Loudoun (VA)."

16.     Plaintiff was initially told that the first three months of her employment were to be training, but Plaintiff was quickly put in the field, to commence sales activity, in the Northern Virginia area, starting around three weeks after her employment.

17.     Thereafter, through management personnel, Defendant began scheduling training meetings, *starting* at 3:30 p.m., or after, at its offices located in Clarksburg, Maryland.

18.     On or about the Summer of 2019, Plaintiff had been diagnosed with nyctalopia, or night blindness, having begun to undergo treatment and instructions for the management of this condition; she was also prescribed, and obtained, special glasses for the condition, which did not altogether ameliorate, or sufficiently reduce the adverse effects of this condition.

19.     As the days got shorter, and dusk started to fall earlier in the evening, in September and October, when called upon to be in Clarksburg, MD until 4:00 p.m. Plaintiff was experiencing difficulties seeing everything, on the 55-mile trip on three different interstates (I-270, I-495 and I-95), with four or more lanes of headlights, in order for Plaintiff to get back to her home in Dumfries, VA, particularly if she left after 4:00 p.m.  At this time, she informed the owner of Defendant, Mark Wilson that she was having difficulty seeing on the way home from Clarksburg to Dumfries, although the problem was less on secondary roads like Route 234, in Prince William County.

20.     On or about October 30, 2019, Tara Wilson took exception to Plaintiff's

expressed inability, to Mrs. Wilson, to appear and undergo a training meeting to start at

4:00 p.m., in Clarksburg, Maryland, after which mix-up Plaintiff stated to Tara that she

needed to leave no later than 4:00 p.m., due to a medical limitation of not being able to

drive at night, with multiple lanes of traffic and lights on interstates 270, 495 and 95; at

this, Ms. Wilson became visibly angry and upset.

21.     The following Monday, November 3, 2019, Plaintiff was called into a

meeting with Mark and Tara Wilson, of Defendant, in which each purported to ask

Clayton "Do you want to work for this company?"  Each also stated: "if you are not

happy here, we can part our ways."  In response to this, Plaintiff stated that she liked and

had expertise in Business Development.

22.     After this, if not despite this, Tara Wilson seemingly continued to go out

of her way to make sure that any training sessions scheduled by her started no earlier than

3:30 p.m., sometimes to be followed by instructions for Plaintiff and others to prepare a

presentation, starting at 4:30 p.m., and present the same to her, or seek approval of the

same, by 5:30 p.m., or some other time, and told Plaintiff she could quit if she "did not

like it."

23.     As described above, after being informed of this disability, and the nature

and extent thereof, and Plaintiff's request for accommodation of her training schedule,

Defendant commenced a campaign of making unprecedented criticism of Plaintiff's

performance, as well as attendance and punctuality, as well as a view of her as being

insubordinate, in circumstances where such criticism and scrutiny was not nearly to the

same degree if not non-existent, before she announced her illness and/or sought

accommodation for the condition, and in a rancorous manner not visited at all upon any

of her non-disabled coworkers.

24.     Around the same October 20, 2019, Defendant, through Mark Wilson, counseled Plaintiff that she was not to use the employer-issued E-Z Pass, for Defendant-required travel to and from Clarksburg, Maryland, and despite the fact that primary focus of Plaintiff's day-to-day employment, and revenue-generating activities, was centered in and around Prince William County,  and Northern Virginia.

25.     On or about November 25, 2019, Plaintiff reiterated to Mark Wilson the existence of this condition and diagnosis, in connection with Defendant's denial of her request to be able to attend some of the training meetings by phone; as a result, Plaintiff again requested an accommodation to her work schedule allowing for an end to her work day involving traveling from the Defendant's headquarters, in Clarksburg, Maryland, at 4:00 p.m. or somewhat earlier, in order to ensure, among other things, that Plaintiff could safely travel home in the afternoons, by car.   In connection with this request, Plaintiff also referenced the fact that her day sometimes began as early as 7:00 a.m., performing a loss assessment with a customer, and as long as it was light outside, she could accommodate an earlier start time.  No meaningful response was made to the request.

26.     Later, in January of 2020, after Ms. Clayton had no choice but to re-schedule an epidural injection she was to receive in her back, from December, to a date in January, Mr. Wilson incorrectly contended that Plaintiff had not shown up for a scheduled shift and/or improperly or insubordinately refused a meeting request for that same day, incorrectly contending he had not been notified in advance of of the changed date of the procedure, adding that if Clayton had back problems, she needed to quit.

27.     In addition to perceiving Clayton to be disabled somehow from driving, as

an apparent result of  the back condition for which she had obtained the epidural

injection, Defendant, through its management agents and employees, was also aware of

Plaintiff's night vision problem, and medical condition, and of the fact that she was

requesting an accommodation to her work and training schedule, as a result of her

seasonal inability to safely drive from Clarksburg, MD to Dumfries VA, during dusk and

or dark conditions, because of this physical condition and limitation.

     28.    On or about December 17, 2019, Defendant, through Mark Wilson,

chastised Plaintiff that her failure to work [in Clarksburg, MD only]  after 4:00 p.m. was

allegedly giving the perception to himself, as well as [he alleged]other company

employees, that Plaintiff did not care about the business of Defendant, an incorrect view

taken by Mr. Wilson and Defendant, as a result of Plaintiff's disability, and her request

for accommodation of that disability, not to mention the representation in the said job

description that 95% of Plaintiff's work would be occurring in Fairfax and Loudoun.  In

response to this, Plaintiff again made reference to it being "pitch black on 495 with 4

lanes of traffic I can't see a thing for the headlights which blinds me."   Defendant

developed an improper view of Plaintiff's sales ability, and work ethic in general, as a

result of her disability, and as a result of her requesting accommodation of this disability.

     29.    On or about the second half of December 2019, Plaintiff contacted the

U.S. Equal Employment Opportunity Commission, in connection with what she saw to be

discrimination, retaliation and/or harassment for seeking accommodation, in the form of

unrealistic sales goals and expectations, particularly in light of the fact that

disproportionately large shares of the leads leading to sales came from plumbers with

whom Defendant had on-again, off-again referral relationships, as well as such

unpredictable things as calamitous plumbing and/or weather or flood events,  as well as what she perceived to be harassing personal treatment, and being forced to return home after dark, having notified Defendant of her disability, and the need for accommodation of that disability, as described above, and then being held back in Clarksburg until dusk, sometimes even for meetings that never ended up occurring, after all.

30.     On or about January 17, 2020, Plaintiff's above-referenced contact with the EEOC resulted in Plaintiff filing a charge of discrimination with the EEOC [which was dual filed with the Maryland Commission on Civil Rights], referencing events occurring between September 12, 2019 and January 17, 2020, and alleging discrimination on the basis of race, retaliation, age and disability.

31.     On or about January 29, 2020, said Charge of Discrimination referenced above was mailed by the EEOC, and received by Defendant's management personnel soon thereafter, in response to which, upon information and belief, Defendant's management personnel incorrectly took the position that Plaintiff had, in insubordinate fashion, just refused to perform *any work, anyplace*, after 4:00 p.m., which was just simply untrue.

32.     Soon after receiving said EEOC charge, in February of 2020, referencing receipt of this Charge, and Plaintiff's inability to drive after dusk and at night, on interstate roads with multiple lanes of traffic and headlights, and attendant adjustment from bright light to shadows, Defendant's personnel again asked the Plaintiff to resign, which she refused to do; Plaintiff was repeatedly asked to resign, and Mr. Wilson also complained to Clayton that she had "too many medical problems."

33.     Despite all of the above, relative to other business development persons,

and Defendant's past performance, Plaintiff's production was excellent, and she was developing more contacts for business out in the field, including insurance agents.

34.    On or about March 30, 2020, Defendant hired an additional, full-time, "Marketing Manager" to work all territories, including those of Plaintiff, but later on, in reprisal for Plaintiff's above-described complaints of non-accommodation and harassment on account of disability and age, as well as race.

35.    On or about April 12, 2020, Defendant reduced Plaintiff's hours to 30 hours per week, from 10:00 a.m. to 4:00 p.m., with an attendant cut in base pay of 25%. As an offered explanation for this change, Defendant falsely claimed that this change had been made necessary by the pandemic and lack of business; upon information and belief, this change was not necessitated or motivated by any lack of business, or the pandemic, as Defendant had just hired a new marketing manager, and was also continuing to look for other business development help.

36.    As further alleged justification for this cut in the Plaintiff's hours, Defendant further [and falsely] claimed that CDC guidance [allegedly] "limits your abilities to do your job as a Business Development Specialist," with Defendant also seeming to falsely imply that face-to-face meetings with customers were essential to performance of Plaintiff's position, when in fact over 80% of relevant business development activity with a given client lead development, including site visits, as well as loss assessments, was performed, and/or could successfully be performed, on a remote and/or contactless basis.

37.    Thereafter, on or about June 5, 2020, Mark Wilson sent Ms. Clayton and e-mail referencing a report prepared by Plaintiff's new co-worker, Ms. Adrianne, and

reprimanded Clayton for Adrianne's report being incorrect.  Plaintiff contacted Adrianne, and Adrianne was incredulous that Mr. Wilson had misconstrued Adrianne's report as Clayton's work, and that Wilson had reprimanded Clayton, in connection with Adrianne's report items.

38.     A few days later, on or about June 9, 2020, Defendant, through Manager Alicia Charney, informed Plaintiff that Defendant had hired a new marketing/business development representative [who is believed not to suffer from any disability Plaintiff is aware of], to start the following Monday, and that Clayton was immediately expected to provide business development and sales reports, as well as growth and revenue projections, in an Excel spreadsheet format; in reply to this, Clayton wrote back that she did not know how to use the Excel spreadsheets, but was willing to learn.

39.     The request of Ms. Charney, and Defendant, for sales projections was further mystifying to your Plaintiff, as Defendant consistently refused to disclose or tell to Plaintiff, the dollar volume, or collected dollar volume, as to each customer produced through her efforts.  Despite this, in narrative form, in Microsoft Word, Plaintiff put together a document containing her best estimates, based upon prior experience, as well as her proposed methods and activities to try to cultivate the likes of additional plumbers, property managers, and insurance agents, to be sources for new client and business development, to take place in the following 90 days.

40.     The next day, around 11:00 a.m., a telephone conversation between Ms. Charney and Ms. Clayton  occurred, in which Charney stated that it was unacceptable for Clayton not to have put her report in an Excel spreadsheet format provided for the purposes, further stating:  "you're our top rep; put this report in Excel."  In response,

Clayton again stated that she was not proficient in Excel, but that she was willing to come to the office to do that, if someone could assist her, met with the following retort from Charney: "We don't have any more time to deal with you; you need to Google it; if you don't get the report done in Excel by 5:00, we'll send someone to pick up the company phone, car, and iPad."

41.     In context, and upon information and belief, Charney's reference to "any more time to deal with you" was a reference to both Clayton's disability, as well as her related previous and ongoing request for accommodation, as well as her filing a charge with the EEOC, against the Defendant; but for Plaintiff's request for reasonable accommodation and/or her filing of the said discrimination charge, Defendant would not have set up the bogus Excel spreadsheet requirement, or terminated Plaintiff's employment.

42.     A little later that morning, Clayton sent a follow-up e-mail to Charney seeking clarification as to her employment status, and also stating her willingness to come into the office to complete the same information in the Excel spreadsheet; Clayton received no reply to this e-mail, but at approximately 2:30 p.m. that same afternoon, and prior to the said 5:00 p.m. "deadline" previously stated by Charney, two Tri State employees known to Clayton, and acting at the instruction of Defendant's management personnel, appeared at Clayton's residence in Woodbridge, indicating they had been instructed to come to pick up the car, phone and iPad, which Clayton provided to them upon request, and Clayton's employment relationship with Tri State thusly ended then and there, with the only *alleged* basis for this action communicated by Defendant, being Plaintiff's failure and/or inability to complete the Excel spreadsheet.

43.     Plaintiff's failure and/or inability to timely complete the Excel spreadsheet was not the real reason for Plaintiff's termination, but was an excuse Defendant made up, for terminating the Plaintiff, as a result of her prior request for accommodation, as well as the filing of the charge, both of which acts constituted protected and/or oppositional activity, under both the ADA, and Title VII.

44.     Defendant imposed this new requirement knowing full well that Plaintiff was not already proficient in Excel, although she was fully capable of making sales data reports, as well as, to a more limited extent, forecasting of future revenue and engagements, based upon the very limited amount of information provided by Defendant to her, as to her dollar volume practice and experience with Defendant, doing business in the Northern Virginia area, as well as with referring plumbers and insurance agencies in the Northern Virginia area, up to that point.

45.     Upon information and belief, similarly situated, non-disabled personnel of Defendant, who also had not engaged in any type of protected activity, or sought accommodation of a disability, were not realistically expected to adhere to these unattainable goals, nor legitimately expected to forecast or project revenue and/or growth volume sources, nor given an arbitrary 5:00 p.m. deadline to complete an Excel spreadsheet, as Defendant purported to do with Plaintiff.  If said persons did complete revenue projections, as referenced above, Defendant's supposed effort to obtain those projections was not a genuine one, as it mostly opted not to provide its business development staff with very limited information regarding contract dollar volumes, and amounts collected, thus rendering largely useless any dollar volume predictions or forecasting, from said persons.

46.    With respect to Defendant's heretofore unannounced work expectation of Excel spreadsheet preparation proficiency, if Defendant did in fact require similarly situated, non-disabled personnel, to adhere to the same rule, or a new work rule, or acquire this new proficiency, said person/s were either provided training, and/or a meaningful opportunity to acquire that proficiency, both on the job and otherwise, or were hired with that proficiency, or in part, on the basis of said proficiency, prior to being legitimately expected to demonstrate it.

47.    In this regard, the work expectations Defendant purported to impose upon Plaintiff were not only not in the position description for the position she applied for, and accepted, but also were not realistically and substantively expected, as legitimate employment expectations, of any persons persons employed by Defendant, much less by Plaintiff, and in particular, those not suffering from any physical limitation and/or disability.

48.    After Plaintiff's discharge, upon information and belief, Defendant tasked other business development persons, not believed to be suffering from any disability known to Defendant, to perform work of the same and/or similar duties as were previously performed by Plaintiff, and/or expanded work in the same or similar regions as previously served by the Plaintiff, for Defendant; Defendant had effectively hired Clayton's replacements, before firing Clayton.

49.    On or about  January 29, 2020, the U.S. Equal Employment Opportunity Commission had issued a letter dismissing Clayton's above-described January 17, 2020 Charge of Discrimination, relating to events occurring between September 12, 2019 and January 17, 2020, Charge No. 531-2020-00660, and she was thusly accorded a "right to

sue" in respect of her January 17, 2020 charge of discrimination; on June 15, 2020, at the recommendation of an EEOC representative, Clayton filed a *pro se* Complaint in this Court, based upon that right to sue notice and charge, which Complaint was later dismissed voluntarily by Clayton, without prejudice to the right to refile, prior to the Defendant being served with the same, by order of this Court dated June 26, 2020 [T.S. Ellis, III, J.].

50.     On June 18, 2020, Mark Wilson wrote to Plaintiff that she would not be receiving all of the Commissions she had earned, because she allegedly had not been able to "accrue 2000 points" during the period after Defendant had cut her work hours, and that certain other monetary deductions would also be made from her accrued commissions, on account of petty cash previously paid to Plaintiff, for purposes of business expenses of Defendant.

51.     On or about November 24, 2020, after having previously contacted the U.S. Equal Employment Commission, Clayton perfected another Charge of Discrimination against Defendant, which upon information and belief, was dual filed with the Virginia Office of Human Rights, in Charge No. 531-2020-03060, referencing dates of discrimination on the basis of disability, age, race and retaliation, occurring during the period of November 25, 2019 through the June 10, 2020 date of her termination, also stating her belief that she was wrongfully terminated from her position as a Business Development Representative for Northern Virginia, for Tri State, because she had filed the prior accommodation request, and disability, age and race discrimination charge with the EEOC.

52.     On or about December 1, 2020, the U.S. Equal Employment Opportunity

Commission issued, and on or about December 4, 2020 Clayton received, a letter

dismissing Clayton's above-described November 24, 2020 Charge of Discrimination,

relating to events occurring between November 25, 2019 and June 10, 2020, on Charge

No. 531-2020-03060, and Clayton was thusly accorded a "right to sue" in respect of her

November 24, 2020 charge of discrimination, and this Complaint is timely filed within 90

days of Plaintiff's receipt of said Notice of Right to Sue letter.  A true and correct copy of

said Dismissal and Notice of Suit Rights is attached hereto, and incorporated herein, at

**Exhibit #1.**

53.     As a direct and proximate result of the Defendant's unlawful actions

enumerated above and below, Clayton has suffered loss of employment, loss of health

and other benefits, loss of wages, and has sustained emotional pain and mental anguish,

sleeplessness, embarrassment, and guilt associated with said separation, resulting in

financial hardship, and damage to her credit rating and financial standing, and continues

to suffer these in amounts continuing to accrue, in an amount to be more particularly

stated at trial.

54.     As referenced and alleged hereinabove and below, all acts of malfeasance,

misfeasance and nonfeasance of the Defendant, acting by and through its' various agents,

as to Clayton, up through and including the termination of her employment with

Defendant, were taken with actual knowledge on Defendant's part, as to its' obligations

at law, and/or under circumstances where Defendant's individual agents acted with

reckless disregard as to what the Defendant's obligations to Clayton were (and are) at

law, and said actions were taken with willful and wanton indifference to, and or as part of

an affirmative effort to thwart and emasculate, the statutorily protected rights of Clayton.

**COUNT I – Disparate Treatment and Non-Accommodation of Disability, in violation of the ADA, 42 U.S.C. § 12112(a) and (b) & § 12117**

55.     Paragraphs 1 through 54 above are hereby incorporated and restated as if set forth verbatim in this Count.

56.     Clayton suffered (and suffers) from a disability, as that term is defined in 42 U.S.C. § 12102, as she had [and has] a physical impairment substantially limiting one or more major life activities, both temporarily and permanently, as said  nyctalopia condition, significantly restricts the conditions, manner and duration, under which she can see things, compared to average persons in the population, and more severely restricts her ability to safely operate a motor vehicle after dusk and/or at night, compared to an average person in the general population.

57.     Clayton also suffered also from a disability, as that term is defined in 42 U.S.C. § 12102, as she had a record of impairment with respect to prior treatment, and employment events, surrounding this condition; Clayton also was regarded by Defendant's management agents as having a perceived impairment to her ability to work, and drive in general and as having "too many medical problems," after her self-identification of this limitation, and the need for accommodation thereof.

58.     Upon information and belief, at all relevant times herein, and consistent with 42 U.S.C. § 12111(5)(A), Defendant was engaged in an industry affecting commerce, with fifteen or more employees for each working day in each of twenty or more calendar workweeks in the current or preceding calendar year.

59.     At all times referenced herein, Clayton was a qualified individual with a disability, as that term is defined at 29 U.S.C. § 12111(8), in as much as she could have performed the essential functions of her former position with Defendant, at the time

Defendant terminated her employment, with or without reasonable accommodation. Night driving on interstate highways, as well as state, county and secondary roads, was and is not an essential function of Plaintiff's employment position with the Defendant.

60.     Title I of the ADA, at 42 U.S.C. § 12112(a), prohibits discrimination by covered entities and employers, such as the Defendant, against an individual, such as Plaintiff, on the basis of disability.

61.     42 U.S.C. § 12112(b)(5) further states that the discrimination proscribed in § 12112(a), as referenced above, against a qualified individual with a disability, such as Plaintiff, includes [42 U.S.C. § 12112(b)(5)(A)] "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability" who is an employee, unless such entity or employer can demonstrate that the accommodation would impose an undue hardship on the operation of the business, or 42 U.S.C. § 12112(b)(5)(B)] "denying employment opportunities to an employee who is otherwise a qualified individual with a disability, if such denial is based on the need of the covered entity to make reasonable accommodation to the physical impairments of the employee."

62.     Defendant knew of Clayton's impairment, as well as Clayton's record of impairment, as well as her unsuccessful efforts at obtaining a reasonable accommodation of that impairment, and Defendant otherwise [incorrectly] perceived Plaintiff to be suffering from an inability to drive.

63.     On several different occasions, and on a continuing basis until and through the June 10, 2020 date of Plaintiff's termination, Defendant failed and/or refused to accommodate Plaintiff's repeated requests for a schedule adjustment, much less propose

or communicate any other possible accommodation, so that she would not have to engage in night driving, as well as derided and chided the Plaintiff, from both an employment performance perspective, and unduly questioned her dedication to said employment, as a result of Plaintiff's ongoing request for this accommodation, and exception to non-accommodation of the same need, all the while denying the accommodation request.

64.     Allowing Ms. Clayton a modified work schedule, and/or drive only during the day, and/or adjusting her work hours in Clarksburg on a seasonal basis, would have caused no significant expense, and would have caused no undue hardship of any kind, to Defendant's business operations.

65.     If it were not for Clayton's disability, and requests for reasonable accommodation resulting from that disability, and protected activity in respect of that disability, and the ongoing need for accommodation of that disability, Defendant would not have taken the adverse action of terminating Clayton.

66.     Ms. Clayton's disability, and seeking of reasonable accommodations as a result of that disability, and the need of Defendant to accommodate the physical limitations of Ms. Clayton, as well as Defendant's overall [albeit incorrect] perception of Ms. Clayton as *also* being somehow "unable to drive," were motivating factors in the Defendant's termination of Plaintiff's employment.

67.     Upon information and belief, Plaintiff was replaced in her functions as a Business Development Specialist, by one to two persons who did not suffer from any serious medical condition, or disability.

68.     Defendant's failure and/or refusal to accommodate Plaintiff's night blindness, and visual limitations, in connection with her schedule and otherwise, was

continuing in nature, and lasted up to, and through, Plaintiff's termination by Defendant.

### COUNT II - Retaliation and Retaliatory Discharge in violation of Title VII, 42 U.S.C. § 2000e-3(a), and the ADA, 42 U.S.C. § 12203

69.     Paragraphs 1 through 68 above are hereby incorporated and restated as if set forth verbatim in this Count.

70.     As described above, Ms. Clayton engaged in statutorily protected activity by requesting accommodation, complaining of the continued scheduling of late afternoon meetings as harassment, and by filing her January 17, 2020 Charge of Discrimination with the EEOC, on the basis of race, age, disability, and retaliation.

71.     On or about January 13, 2020, after a co-worker of Clayton, one  January of 2020, Clayton also told one or more of Defendant's management personnel that she thought it was discrimination on the basis of age, for Defendant to require a waiver of health insurance coverage from

72.     Defendant, through its agents and employees, was aware of Plaintiff's above-referenced protected activities, and Clayton had a good faith, reasonable belief that Tri State's terms and conditions upon which she was employed, constituted violations of one or more antidiscrimination laws, including, but not limited to, the ADA and Title VII.

73.     As a direct and proximate result of these complaints, and protected activities, inclusive of continuing to seek accommodation, as well as the prior charge of discrimination, Plaintiff was retaliated against by Defendant, and held to unrealistic and fictitious employment standards, stripped of work,  replaced, and then terminated from Defendant's employ, and Clayton was also thusly made an "example of" to other workers, with concordant loss of wages and benefits, both past and future, all acts and consequences which would dissuade a reasonable worker from making or supporting

such a similar charge of discrimination, or request reasonable accommodation of a physical impairment, or disabling condition.

### COUNT III – Breach of Contract

74.     Paragraphs 1 through 54 above are hereby incorporated and restated as if set forth verbatim in this count.

75.     On or about the inception of your Plaintiff's employment with Defendant, Plaintiff and Defendant Blackwood Construction Group, Inc. entered into an oral and written agreement providing that the Plaintiff would be paid, as wages, without offset or deduction, a commission equal to three per centum (3%) of the gross contract price of all jobs produced through Plaintiff's efforts, coming from insurance agents, plumbers, property managers, and bid programs, and 5% commission on gross margin for all other commercial and jobs coming from other sources.

76.     Under the parties' commissions agreement referenced above, Plaintiff was to be paid upon collection of monies from the customer, or paid on behalf of the customer.

77.     Upon information and belief, all of the customer contracts produced by the Plaintiff during her employment with Defendant went beyond the rescission period, were completed, and Tri State has received final payment on each.

78.     Pursuant to the commissions agreement between the parties, for contracts produced by the Plaintiff, and work performed, during the period of December 31, 2019 through June 10, 2020, there remains an overall unpaid commissions balance overdue and owing to the Plaintiff, from Defendant Tri State, in the approximate gross commission sum of twenty thousand dollars ($20,000.00).  In as much as Plaintiff was an employee of

Defendant, Defendant is also legally responsible to pay over to governmental units for the additional roughly 7.6% employer's share of FICA and FUTA taxes on said sum, or an approximate additional amount owing on that sum, of fifteen hundred twenty dollars ($1,520.00).

79.    Despite Plaintiff having fully and faithfully performed her obligations in connection with the agreement between the parties, as well as the commissions contract, and despite inquiries and requests for payment of all commissions owed, Defendant has failed and/or refused to pay Plaintiff any any amount whatsoever, on account of the said services performed by your Plaintiff, and has failed and refused to account to Plaintiff regarding commissions on jobs produced through her efforts, and said failure and/or refusal to pay the remaining commissions due and owing to Plaintiff, is ongoing in nature.

## Prayer for Relief

WHEREFORE, your plaintiff prays that this Court enter an Order as follows:

(a)  ordering that plaintiff shall be reinstated into the employ of defendant, in her former capacity, together with all compensation and benefits of said employment, from the date her employment was terminated, as if he had not been terminated, and as if she had not been subject to discrimination, retaliation and and/or disparate treatment and/or any unlawful behavior or result of any kind, as described above, and less any wages earned by her elsewhere, in mitigation; and

(b)     issuing an appropriate prohibitory injunction restraining the defendant from continuing to employ procedures and methods of administration and personnel management, as are unlawful as alleged herein, as to the plaintiff and any others similarly

situated, deprive, or have the effect of depriving, persons of their protected rights under the ADA and/or Title VII; and

(c) rendering a money judgment awarding Jennifere Clayton recovery from defendant a sum of money equal to the monetary value of all wages and benefits of employment lost, (estimated to trial), on account of her unlawful separation from the employ of defendant, less any interim earnings or amounts which could be earned, in suitable employment, with reasonable diligence, in mitigation of said damages, said overall amount to be subject to proof at trial, in an estimated overall back pay amount of one hundred fifty-five thousand dollars ($155,000.00);

(d)  rendering a money judgment representing any and all actual monetary losses, including, but not limited to wages, sustained by the plaintiff, and recoverable economic losses incurred, directly or indirectly, as a result of defendant's above-referenced violations of the ADA and Title VII, including, but not limited to, employer-paid share/s of premium/s and/or the difference between amounts incurred by Plaintiff elsewhere for equivalent coverages, and the amount she would have paid herself, if receiving the same coverages through Defendant's health insurance plan, for medical coverage, as well as foregone sales commissions;

(e)  in the alternative to the reinstatement back into Defendant's employ prayed for in paragraph (a) of this Prayer for Relief, and absent such reinstatement, a sum of money in the nature of front pay, sufficient to compensate the plaintiff for all future (calculated forward from the date of trial) wages, commissions and benefits lost through Defendant's unlawful termination of the plaintiff's employment; and

(f) awarding a money judgment to plaintiff against defendants, in the non-

economic compensatory damage sum of fifty thousand dollars ($50,000.00); and

(g)  awarding a money judgment to plaintiff against defendants, or monetary award component, in the amount of $20,000, or such other amount as is shown by the evidence to be owing to Plaintiff on account of  Defendant's breach of contract to pay commissions; and

(h) awarding pre-judgment and post-judgment interest, as allowable and appropriate, at law, on all amounts otherwise awardable, or awarded, herein; and

(i)  awarding plaintiff's reasonable attorney fees, expert witness fees and costs, and other litigation-related costs incurred in prosecution hereof; and

(j) awarding such other and further relief as is appropriate to the premises of law, equity and the facts of this case.

<u>Jury Demand</u>

Your plaintiff hereby demands trial by jury as to all claims for which jury trial is available at law.

Respectfully submitted,

JENNIFERE CLAYTON
By Counsel

_____/s/ Christopher R. Rau_____
Christopher R. Rau (Va. State Bar No.  34135)
Attorney for Plaintiff Jennifere Clayton
Law Offices of Christopher R. Rau
200 Little Falls Street, Suite 501
Falls Church, VA  22046
(703) 536-1660 – Telephone
CRRAU@AOL.COM – E-Mail
*Counsel for Plaintiff Jennifere Clayton*